IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| ROBERT J. PARKER, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 4:14CV3195 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| CRETE CARRIER CORPORATION, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Robert Parker alleges that his former employer, defendant Crete Carrier Corporation ("CCC"), discriminated against him under the Americans with Disabilities Act ("ADA") by requiring him, and all CCC truck drivers with a "body mass index" of 33 or above, to undergo a sleep study as a condition of continued employment; by asking Parker if he used a certain medical device used to treat obstructive sleep apnea; and by regarding Parker as having an impairment, all of which resulted in CCC taking Parker "out of service" when he refused to comply with CCC's medical-examination requirement.[1] CCC argues that requiring a limited class of drivers to submit to a sleep study is both job-related and consistent with business necessity, and therefore permissible under the ADA.

Parker has filed a motion for partial summary judgment on liability only[2]

---

[1]*See* Filing 1 (Complaint) and Filing 8 (Rule 26(f) Report).

[2]Parker's complaint, motion for partial summary judgment, and related briefs are not a model of clarity. The complaint (Filing 1-2) consists of one cause of action entitled "ADA," which includes the words "discrimination," "retaliation," and "perceived by"—all stemming from CCC's alleged violation of 42 U.S.C. § 12112(d)(4)(A) by requiring Parker to undergo a medical examination. Parker's "Motion for Summary Judgment on Liability" broadly asks for judgment as a matter of law on liability and a trial on "damages and relief." That motion is supported by a

(Filing 42) and a motion in limine (Filing 49) to exclude the testimony of CCC's expert, Richard J. Schwab, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant CCC has filed a motion for summary judgment (Filing 52) and a motion in limine (Filing 57) to limit the opinion testimony of Parker's disclosed expert and medical provider, Jill McAdams PA-C.

## I. UNDISPUTED MATERIAL FACTS

For purposes of the pending motions for summary judgment, these facts are undisputed:

1. Defendant Crete Carrier Corporation ("CCC") is a domestic corporation duly formed and subsisting under the laws of the State of Nebraska. (Filing 1-2, Complaint ¶ 6.) CCC is an over-the-road trucking company based in Lincoln, Nebraska, and operating throughout the continental 48 United States. CCC employs more than 6,100 employees, with more than 5,000 working as over-the-road drivers of commercial motor vehicles ("CMVs"). (Filing 54-8, Aff. Raymond Coulter ¶ 3.)

2. Working as an over-the-road truck driver is a demanding job with great

---

brief that solely discusses the claim that CCC discriminated against Parker by requiring him to undergo a sleep study, in violation of 42 U.S.C. § 12112(d)(4)(A). (Filings 42 & 43.) *See also* Filing 70, Pl.'s Br. Opp'n Def.'s Mot. Limine at CM/ECF p. 1 ("Plaintiff has brought this case because his rights under the Americans with Disabilities Act were violated by the request that he submit to an unlawful medical examination."); Filing 69, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF pp. 2 & 33 n.5 (stating that the "central legal question in this case is whether or not [CCC's] sleep apnea policy and program are legal" and admitting that "[t]he Plaintiff only moved for partial summary judgment on the issue of the legality of the request for the sleep study."). Because Parker vaguely mentions a "regarded-as claim" in his brief opposing CCC's motion for summary judgment and in the parties' Rule 26(f) report, I shall address both the medical-examination claim and the perceived-disability claim. (Filing 8; Filing 69 at CM/ECF p. 34)

responsibility. Drivers are entrusted with powerful equipment and valuable cargo while traveling on the same roadways as the general public. (Filing 54-8, Aff. Raymond Coulter ¶ 4.)

3. On or about July 3, 2006, CCC hired plaintiff Robert J. Parker as an over-the-road truck driver. (Filing 44-1, Aff. Robert J. Parker ¶ 3.) Throughout Parker's employment, he held the position of truck driver and trainer based out of North Platte, Nebraska. (Filing 44-1, Aff. Robert J. Parker ¶ 4.)

4. In 2012, CCC gave Parker an award entitled "FIVE YEARS ACCIDENT FREE DRIVING—In the finest tradition of Professional Driving." (Filing 44-1, Aff. Robert J. Parker ¶¶ 5-6; Filing 43-1, Ex. A.) That year, CCC also named Parker its top trainer. (Filing 44-1, Aff. Robert J. Parker ¶ 7.)

5. CCC's drivers, including Parker, are required to meet the minimum qualification requirements with respect to physical qualifications and examinations of drivers of CMVs in interstate commerce. (Filing 54-8, Aff. Raymond Coulter ¶ 6 (citing 49 C.F.R. § 391.41, *et seq*. ("DOT regulations")).) Parker concedes that he was required to maintain certification under the DOT regulations and that CCC was entitled to impose more stringent safety standards, but only if those standards were not in violation of the ADA. (Filing 69, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF p. 28.)

6. On June 11, 2012, Parker participated in a Commercial Driver Fitness Determination examination administered by the Cheryl Hunt, APRN. (Filing 44-1, Aff. Robert J. Parker ¶ 26; Filing 43-4.) Hunt found that Parker met the standards in 49 C.F.R. § 391.41 and qualified for a two-year certificate. At this visit, Parker's height was recorded at 6'5" and his weight at 296 pounds, making his body mass

3

index³ ("BMI") greater than 35. (Filing 54-8, Aff. Raymond Coulter ¶ 10; Filing 43-4.)

7. CCC's drivers are also required to comply with CCC's legal policies and procedures, including, but not limited to, CCC's Department of Transportation Physical Policy. (Filing 54-8, Aff. Raymond Coulter ¶ 7.) CCC's "sleep apnea policy and program" provides that "Drivers who have a Body Mass Index (BMI) of 33 or greater as determined from the DOT physical completed by a Company physician may be required to complete a sleep study." (Filing 54-14 at CM/ECF p. 10.) Parker acknowledged that he received notice of, and agreed to abide by, this policy on April 27, 2011. (Filing 54-14 at CM/ECF pp. 10-12.)

8. Under CCC's sleep apnea program, a driver meeting the selection criteria is routed to one of CCC's sleep study locations for testing. After undergoing the study, a board-certified physician may make a diagnosis of [obstructive sleep apnea ("OSA")] or another sleep disorder which may require treatment. A diagnosis of OSA may disqualify a driver from operating a CMV unless the condition is appropriately treated. (Filing 54-1, Aff. Timothy Aschoff ¶¶ 24, 25.)

9. CCC's sleep apnea program took more than three years to fully implement across the country due to the significant number of drivers to be tested (more than 1,800 then-current drivers) and the availability of testing labs and doctors to interpret the tests. In implementing the sleep apnea program, CCC first started with its largest terminals (averaging 550 to 600 drivers) and worked its way to its smaller facilities (averaging 70 drivers). Due to its small size and lack of access to one of the three national sleep labs, the North Platte terminal was one of the last terminals added to CCC's sleep apnea program in July 2013. From inception of the sleep apnea

---

³Coulter used the National Heart, Lung, and Blood Institute's website to calculate BMI. *See* http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

4

program to December 15, 2014, CCC conducted approximately 3,257 sleep studies. (Filing 54-1, Aff. Timothy Aschoff ¶¶ 30, 32-34.)

10. CCC's stated purpose of its sleep apnea policy is "to comply with the DOT regulations prohibiting the certification of a driver with a disqualifying condition, i.e., respiratory dysfunction, and to address the significant safety concerns associated with OSA and fatigued drivers of CMVs." (Filing 54-1, Aff. Timothy Aschoff ¶ 20.) CCC implemented its sleep apnea program in reliance on DOT regulations and recommendations by the Federal Motor Carrier Safety Administration. (Filing 54-1, Aff. Timothy Aschoff ¶ 5.)

11. CCC is not aware of any occasion when Parker has fallen asleep while driving or working. (Filing 44-1, Aff. Robert J. Parker ¶ 9.)

12. On or about July 2, 2013, terminal manager Russ Gerlach called Parker and asked him if he used a CPAP[4] machine. Gerlach said that he was scheduling Parker for a sleep study the following Monday "because of his size," and that CCC was requiring Parker to take a sleep study as a condition of continuing his employment. (Filing 44-1, Aff. Robert J. Parker ¶¶ 11-13.)

13. Upon Gerlach's request that Parker submit to a sleep study, Parker visited his regular medical provider. (Filing 44-1, Aff. Robert J. Parker ¶ 19.)

14. On July 11, 2013, Parker's medical provider, Jill McAdams PA-C[5], diagnosed Parker with "(1) Fatigue (2) weight gain (3) Sleep disturbance." (Filing 54-13, Dep. Jill McAdams at 64:1-7; Filing 54-13 at CM/ECF p. 71.) Parker reported to

---

[4]"CPAP" stands for continuous positive airway pressure.

[5]"PA-C" means a certified physician's assistant. (Filing 54-13, Dep. Jill McAdams at CM/ECF pp. 8-9.)

5

her that he was "concerned about sleep apnea," he "snores a lot," and he only received about "5 hours of sleep a night," which McAdams agreed was on the "short side." (Filing 54-13, Dep. Jill McAdams at 21:3-23:21, 26:17-27:2; Filing 54-13 at CM/ECF p. 71.) At that time, Parker's weighed 311 pounds and was 6'5" tall, equating to a 36.9 BMI. (Filing 54-13, Dep. Jill McAdams at 20:10-15.)

15. Both witnesses designated as "experts" in this case agree that a person's BMI is strongly associated with obstructive sleep apnea. (Filing 54-13, Dep. Jill McAdams[6] at 23:6-9, 34:23-35:1; Filing 54-11, Dr. Richard J. Schwab[7] Report at CM/ECF p. 7.) They also agree that obstructive sleep apnea would qualify as a "respiratory dysfunction" under the DOT regulations governing physical qualifications and examinations of drivers of CMVs in interstate commerce, 49 C.F.R. § 391.41, *et seq*. (Filing 54-13, Dep. Jill McAdams at 14:8-15; Filing 54-11, Dr. Richard J. Schwab Report at CM/ECF p. 7.) Finally, they agree that polysomnography (a sleep study) is the "gold standard" for diagnosing obstructive sleep apnea. (Filing 54-13, Dep. Jill McAdams at 35:15-25; Filing 54-11, Dr. Richard J. Schwab Report

---

[6]Jill McAdams received her master's degree in physician assistant studies from the University of Nebraska Medical Center in 1994, and has practiced since that time. She testified that she does not "hold [her]self out as an expert on sleep apnea," nor did she submit a CV or expert report. (Filing 54-13, Dep. Jill McAdams at 64:14-16.) However, she is certified to perform DOT fitness-for-duty examinations for truckers who seek to maintain their commercial driver's licenses, and she was Parker's treating healthcare provider. (Filing 54-13, Dep. Jill McAdams at 13:19-14:4.)

[7]Dr. Richard J. Schwab is a professor of medicine at the University of Pennsylvania, and is board-certified in sleep medicine, internal medicine, and pulmonary and critical care medicine. He is co-director of the Penn Center for Sleep Disorders, which is an accredited sleep laboratory where polysomnography is performed. Dr. Schwab interprets over 700 sleep studies per year, including those for many commercial drivers. He lectures internationally, teaches, and writes numerous chapters and articles for peer-reviewed journals on the relationship between obesity and sleep apnea. (Filing 54-9, Decl. Richard J. Schwab, MD; Filing 54-10, CV of Richard J. Schwab, MD; Filing 54-11, Dr. Richard J. Schwab Report.)

at CM/ECF pp. 3 & 7.) Parker admits that driver fatigue is strongly associated with increased risk of motor vehicle accidents. (Filing 66.)

16. Based on his education, clinical training, research, experience, and review of documents provided to him, Dr. Schwab opines that:

> "Studies have shown that 95% of apnea sufferers do not know that they have the disorder."
>
> "Studies in commercial drivers . . . have identified that BMI of 32.7 kg/m² (i.e., rounded to 33.0) is the optimal cut-point to identify subjects likely to have OSA."
>
> "[T]he primary anatomic risk factor for sleep apnea is obesity."
>
> "[P]atients with sleep apnea can be as impaired in driving skills as those who are over the legal blood alcohol concentration."
>
> "The treatment of choice at the present time for patients with obstructive sleep apnea is CPAP (continuous positive airway pressure) therapy."

(Filing 54-11, Dr. Richard J. Schwab Report.)

17. Believing that CCC's requirement that Parker undergo a sleep study to be unlawful, Parker objected to taking the sleep study and refused to do so on July 28, 2013. (Filing 44-1, Aff. Robert J. Parker ¶¶ 14-15; Filing 54-8, Aff. Raymond Coulter ¶ 11.)

18. Apart from CCC's overall concerns of OSA and fatigued driving among its drivers with BMIs of 33 and above, there was no medical or other concern solely applicable to Parker that prompted CCC to request that Parker undergo a sleep study.

(Filing 44-1, Aff. Robert J. Parker ¶¶ 16-17.)

19. Parker admits that he does not have a disability or a substantially limiting impairment, nor has he ever been diagnosed with sleep apnea. (Filing 44-1, Aff. Robert J. Parker ¶¶10, 18.)

20. Raymond Coulter, Vice-President of Safety and Compliance at CCC, called Parker and told him if he would not submit to the sleep study, he would be out of service and assigned no hours. (Filing 44-1, Aff. Robert J. Parker ¶ 24; Filing 54-8, Aff. Raymond Coulter ¶ 14.)

21. On July 22, 2013, Jill McAdams PA-C gave Parker a prescription indicating that "I do not feel it is medically necessary for [the plaintiff] to have a sleep study." (Filing 44-1, Aff. Robert J. Parker ¶¶ 20, 21; Filing 43-3.)[8] There was no indication in the note that McAdams was conducting a DOT certification evaluation of Parker or evaluating Parker according to CCC's program. (Filing 54-8, Aff. Raymond Coulter ¶ 18.) There was also no indication that McAdams conducted a sleep study; she provided no reasoning for her opinion; and her opinion did not confirm or rule out a diagnosis of OSA. Parker submitted this prescription to CCC on July 29, 2013. (Filing 54-8, Aff. Raymond Coulter ¶ 16.)

---

[8]CCC objects to the admissibility of this evidence, claiming it is irrelevant and lacking foundation. (Filing 55, at CM/ECF p. 5.) CCC's objection is overruled. Foundation is not lacking because McAdams, the author of the prescription, is qualified to testify that she did indeed write such a prescription, regardless of her motivations for doing so. Further, the evidence is relevant to show that CCC uniformly enforced its sleep apnea policy for all drivers having a certain BMI, regardless of their individual physicians' opinions. *See Conroy v. New York State Dep't of Corr. Svs.*, 333 F.3d 88, 102 (2nd Cir. 2003) ("if the policy is applied inconsistently, [the employer] will find it more difficult to prove business necessity"); *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001) ("an employer's differential application of a medical examination requirement is evidence of what is 'necessary' to the employer's business").

22. After July 28, 2013, CCC stopped giving Parker work and placed him "out of service" due to his unwillingness to comply with CCC's sleep apnea program by undergoing the requested testing. (Filing 54-8, Aff. Raymond Coulter ¶ 14; Filing 44-1, Aff. Robert J. Parker ¶¶ 22, 23.) Parker was on personal leave with CCC until October 4, 2013. (Filing 54-8, Aff. Raymond Coulter ¶ 21.) On October 2, 2013, CCC learned that Parker had been employed with another entity since August 26, 2013, leading CCC to conclude that Parker had resigned his position. (Filing 54-8, Aff. Raymond Coulter ¶ 22.)

23. Parker has continued to drive a truck for other employers. (Filing 44-1, Aff. Robert J. Parker ¶ 25.)

24. On June 10, 2014, Parker participated in a Commercial Driver Fitness Determination examination administered by Cheryl Hunt, APRN. (Filing 44-1, Aff. Robert J. Parker ¶ 27; Filing 43-5.) Hunt found that Parker met the standards in 49 C.F.R. § 391.41 and qualified for a two-year certificate. Hunt noted, "No concerns with Health History. No Limitation. No medications." (Filing 43-5.)

## II. EVIDENTIARY ISSUES

Parker objects to the admissibility of Dr. Schwab's expert report based on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). "The opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). By virtue of his specialized knowledge in the field of obesity and obstructive sleep apnea, his creation and review of a significant amount of peer-reviewed scientific literature, his extensive training in the field, and his observations in reading 700 sleep studies annually qualify Dr. Schwab as an expert for purposes of this case and provide more than adequate foundation for Dr. Schwab's opinions cited above. Parker argues that there may be

studies supporting a contrary position, "but it is not the province of the court to choose between the competing theories when both are supported by reliable scientific evidence." *Kuhn*, 686 F.3d at 633. (Filing 51, Pl.'s Br. Supp. Mot. Limine at CM/ECF p. 5.)

Further, I can consider Dr. Schwab's report since Parker had an opportunity to depose him when he was identified as an expert, but did not do so. (Filing 19 (Certificate of Service indicating service of Defendant's expert witness disclosures on Plaintiff on March 2, 2015).) *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 827 (8th Cir. 2009) (court can consider expert's report on motion for summary judgment when verified by affidavit or deposition; overruling objection to expert's report when party had opportunity to depose expert upon his identification as an expert). Therefore, and to the extent I have cited and relied on Dr. Schwab's opinions, Parker's *Daubert* motion shall be denied.

Because of her alleged lack of education, training, and experience, CCC objects to the opinion testimony of Parker's designated "expert" witness, Jill McAdams PA-C, regarding sleep apnea, driver fatigue, CCC's sleep apnea program, and the medical necessity for Parker to undergo a sleep study. (Filing 57.) McAdams received her master's degree in physician assistant studies from the University of Nebraska Medical Center in 1994, and has practiced since that time. McAdams testified by deposition that she does not "hold [her]self out as an expert on sleep apnea," nor did she submit an expert report or a CV. While clearly not an "expert" on sleep apnea, McAdams was Parker's treating medical provider and is qualified to provide information about Parker's examination, prescriptions, and medical history, as well as medical information she knows from her education, training, and experience as a physician's assistant. Further, since the time she examined Parker, McAdams has become certified to perform DOT examinations of CMV drivers, enabling McAdams to testify about the requirements of those examinations and how OSA relates to DOT

10

regulations.[9] Therefore, to the extent I have cited and relied upon McAdams' testimony, CCC's motion in limine will be denied.

Finally, in its summary judgment briefs, Parker's counsel objects to the admissibility of several paragraphs[10] of Tim Aschoff's affidavit, as well as many exhibits[11] attached thereto. Because I did not rely on any of this evidence in ruling on the parties' motions for summary judgment, I shall deny those objections as moot.

## III. ANALYSIS

### A. *Medical-Examination/Inquiry Claim*

The Americans with Disabilities Act, as amended, prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a) (Westlaw 2015). Such discrimination includes "medical examinations and inquiries." § 12112(d)(1). Specifically, the ADA provides:

(A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an

---

[9]I note that CCC's brief in support of its motion for summary judgment cites the very testimony it seeks to exclude. (Filing 55, Def.'s Br. Supp. Mot. Summ. J. at CM/ECF pp. 30-31 (referring to McAdams' deposition testimony regarding symptoms of OSA, that a high BMI and OSA are highly associated, that polysomnography is the best method to test for OSA, that OSA is highly correlated with truck-driver fatigue, and that such fatigue is associated with an increased risk of motor vehicle accidents).)

[10]Parker objects to paragraphs 7-18 and 35. (Filing 69, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF pp. 24-26.)

[11]Parker objects to Filings 51-1, 51-2, 51-3, 54-2, 54-3, 54-4, 54-6, and 54-7. (Filing 69, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF pp. 21-23.)

11

individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

§ 12112(d)(4)(A). "This provision applies to all employees, regardless of whether the employee has an actual disability." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *see also Conroy v New York State Dep't of Corr. Svs.*, 333 F.3d 88, 94 (2nd Cir. 2003) ("a plaintiff need not prove that he or she has a disability unknown to his or her employer in order to challenge a medical inquiry or examination under 42 U.S.C. § 12112(d)(4)(a)"). The purpose of this provision is "to prevent the administration to employees of medical tests or inquiries that do not serve a legitimate business purpose. 29 C.F.R. Pt. 1630, App. (EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act) (Westlaw 2015).[12]

Most case law interpreting this provision involves medical testing of employees who have exhibited symptoms or behaviors that cause their employers to question the individual employees' fitness to perform their jobs. Here, in contrast, we have a broad, mandated medical-examination policy applicable to a defined class of employees—those with a BMI of 33 or greater. *Conroy*, 333 F.3d at 97 (noting lack of case law regarding the "business necessity" of generally applicable policies as opposed to individual inquiries); *E.E.O.C. v. United States Steel Corp.*, Civil Action No. 10-12, 2013 WL 625315, at *13 (W.D. Penn. Feb. 20, 2013) ("almost all cases involving § 12112(d)(4)(A) address claims of specific individuals who were forced to undergo medical testing instead of a broad mandate that was generally applicable as to a subset of employees"); *Wice v. Gen. Motors Corp.*, No. 07-10662, 2008 WL 5235996, at *3 (E.D. Mich. Dec. 15, 2008) ("Relatively little case law exists regarding

---

[12] "[T]he agency's policy statements, embodied in its compliance manual and internal directives, . . . reflect a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008).

12

the proper interpretation of 'business necessity' in [the] context [of policies requiring periodic medical examinations for a class of employees].")

Despite the relatively few cases analyzing broadly applicable medical-examination policies under section 12112(d)(4)(A), some general principles of law have emerged that may be applied in the context involved here.

The question of whether a medical examination or inquiry is job-related and consistent with business necessity is an objective one. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014); *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001).

> To demonstrate compliance with § 12112(d)(4)(A), the employer bears the burden to show the asserted "business necessity" is vital to the business and the request for a medical examination or inquiry is no broader or more intrusive than necessary. *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97-98 (2d Cir. 2003).

*Thomas*, 483 F.3d at 527.

"Business necessity" under section 12112(d)(4)(A) of the ADA includes public and workplace safety. *Thomas*, 483 F.3d at 527 (considering employer's need "to ensure the safety of the public" in examining whether employer's request for employee's fitness-for-duty psychological examination was job-related and consistent with business necessity under ADA); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) (prophylactic psychological examinations of employees "can sometimes satisfy the business necessity standard, particularly when the employer is engaged in dangerous work"; legitimacy of fitness-for-duty examination "is heavily colored by the nature of [the plaintiff's] employment"); *Conroy*, 333 F.3d at 98 (legitimate business necessity may include safety in the workplace); *E.E.O.C. v. United States Steel Corp.*, 2013 WL 625315, at *13 ("There is no question that maintaining workplace safety is a legitimate and vital business necessity."); *Wice,*

2008 WL 5235996 (for purposes of 42 U.S.C. § 12112(d)(4)(A), "[e]nsuring a safe workplace is a business necessity"; screening employees for medical conditions that may interfere with ability to drive mobile equipment safely is reasonably effective method of achieving employer's goal of workplace safety; "Common sense suggests that [the employer] should not have to wait for an accident to occur to justify screening employees."); *Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 341 F. Supp. 2d 432, 447 (S.D.N.Y. 2004) (maintaining workplace and public safety constituted "business necessity" under section 12112(d)(4)(A) with regard to policy requiring employees to provide nature of illness when taking sick leave as to employees with safety-sensitive jobs, such as bus drivers "and any other group of employees who perform safety-sensitive work"; "The danger that may be posed by a bus driver who is unfit for duty due to illness or medication is obvious—a single accident could injure many people. The law recognizes the importance of these concerns." (footnotes omitted).)

After careful review of the evidence, and keeping in mind the standard of review applicable to motions for summary judgment[13], CCC has shown that its policy is job-related, vital to its business, and no broader or more intrusive than necessary.

### 1. *Job-Related*

The physician witnesses for both Parker and CCC have established that a person's body mass index is strongly associated with obstructive sleep apnea, and that OSA would qualify as a "respiratory dysfunction" under the DOT regulations governing physical qualifications and examinations of drivers of commercial motor

---

[13]"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In considering a motion for summary judgment, I must not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue. Rather, [I must] view the facts and evidence as a whole in the light most favorable to the nonmoving party." *Thomas*, 483 F.3d at 526.

vehicles in interstate commerce. Such regulations include 49 C.F.R. § 391.41(b)(5), which provides, in part, that "A person is physically qualified to drive a commercial motor vehicle if that person . . . [h]as no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely."

Obviously, CCC's sleep apnea policy is heavily related to the ability of its drivers to lawfully continue to drive under DOT regulations, and is thus "job-related" under 42 U.S.C. § 12112(d)(4)(A).

### 2. Business Necessity

CCC has a vital interest in maintaining the safety of its employee-drivers, the cargo CCC carries for its customers, and the public who travels alongside CCC drivers daily. The potential danger posed by a truck driver asleep at the wheel "is obvious and undisputed." *New York City Transit Auth.*, 341 F. Supp. 2d at 450 (discussing unfit bus operators). Indeed, Parker himself admits that driver fatigue is strongly associated with increased risk of motor vehicle accidents. (Filing 66.)

The evidence filed in conjunction with the parties' motions for summary judgment establishes that OSA can cause driver fatigue; the biggest predictive factor of OSA is obesity; obesity can be objectively measured by calculating one's BMI; and polysomnography (a sleep study) is the "gold standard" for diagnosing OSA. CCC's sleep apnea policy and related inquiries serve to directly confirm or rule out OSA for a narrowly defined class of its employees who meet an objective BMI standard. CCC's consistently-applied policy[14] is no broader or more intrusive than necessary to

---

[14]There is no evidence that CCC's sleep apnea policy is disparately applied. *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001) ("just as we routinely hold that evidence of differential treatment among similarly situated employees is probative on the issue of discrimination in Title VII suits, an employer's

achieve CCC's business necessity of keeping CCC's drivers, cargo, and the traveling public safe. *New York City Transit Auth.*, 341 F. Supp. 2d at 450-51 ("If the Policy makes even a small contribution to reducing the risks posed by unfit drivers, it is amply justified.").

Finally, and as discussed above, many courts have held that public and workplace safety constitute "business necessity" under section 12112(d)(4)(A) of the ADA, particularly when the employee's job directly impacts the public, as is the case here.

### 3. Conclusion

Based on CCC's knowledge of DOT regulations, Federal Motor Carrier Safety Administration recommendations, and obvious safety concerns associated with OSA and fatigued drivers of commercial vehicles, CCC had sufficient objective evidence upon which it could determine that requiring its drivers with a BMI of 33 or above to submit to a sleep study was job-related and consistent with business necessity within the meaning of the ADA, and a reasonable jury could not find otherwise. Further, since the inquiry about whether Parker used a CPAP machine was made at the same time as Parker was instructed to submit to a sleep study, the inquiry did not violate 42 U.S.C. § 12112(d)(4)(A), as it was inextricably intertwined with the discussion between Parker and his supervisor about the required (and permissible) sleep study.

Because CCC has made a showing of job-relatedness and business necessity of its inquiry and medical-examination request, and Parker has failed to rebut that showing, Parker's claim under 42 U.S.C. § 12112(d)(4)(A) must fail, and summary judgment must be granted in favor of CCC on this claim.

---

differential application of a medical examination requirement is relevant evidence of what is 'necessary' to the employer's business" (citation omitted)).

## B. *Perceived Disability Claim*

An individual is regarded as having a disability if he or she has been discriminated against "because of [a] . . . perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Absent direct evidence of disability discrimination, "regarded-as" disability claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010). Assuming, without deciding, that Parker could make a prima facie showing of perceived disability discrimination, CCC has demonstrated a legitimate, non-discriminatory reason for taking Parker out of service—that is, his refusal to comply with company policy by undergoing a sleep study based on his BMI, as measured at a standard, mandatory DOT certification medical examination given to all CMV drivers. As discussed above, taking Parker out of service was a consequence of not complying with CCC's narrowly defined sleep apnea policy that was developed in reliance on DOT regulations and recommendations by the Federal Motor Carrier Safety Administration and is uniformly applicable to all of CCC's drivers having a BMI of 33 or above. Because Parker has failed to show that CCC's stated reason for its action is pretextual and based on intentional discrimination, summary judgment must be granted in favor of CCC on this claim. St. Martin v. City of St. Paul, 680 F.3d 1027, 1033 (8th Cir. 2012) (elements of ADA discrimination claim).

IT IS ORDERED:

1.  Plaintiff's motion for partial summary judgment on liability only (Filing 42) is denied;

2.  Defendant's motion for summary judgment (Filing 52) is granted;

3.  To the extent the court has cited and relied on the expert report of

Richard J. Schwab, Plaintiff's motion in limine (Filing 49) to exclude such testimony is denied;

4. To the extent the court has cited and relied on the testimony of Jill McAdams PA-C, Defendant's motion in limine (Filing 57) is denied;

5. Judgment in favor of Defendant and against Plaintiff shall be entered by separate document.

DATED this 20th day of January, 2016.

BY THE COURT:
*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.